KAYE SCHOLER LLP
Richard G. Smolev (RS 2222)
Piper A. Brock (PB 6335)
425 Park Avenue
New York, New York 10022
(212) 836-8000 (telephone)
(212) 836-8689 (facsimile)

*Counsel for Appellant*
*Lone Star Air Partners LLC*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT NEW YORK

| | | |
|---|---|---|
| **LONE STAR AIR PARTNERS, LLC** | : | Case No.  07-CV- 11143 (SAS) |
| | : | |
| **Appellant,** | : | Chapter 11 Case No. |
| | : | 05-17923 (ASH) |
| **v.** | : | |
| | : | (Jointly Administered) |
| **DELTA AIR LINES, INC., and** | : | |
| **THE POST-EFFECTIVE  DATE** | : | |
| **COMMITTEE OF DELTA AIR** | : | |
| **LINES, INC.** | : | |
| **Appellees.** | : | |

## APPELLANT'S OPENING BRIEF ON APPEAL

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................ 1

**JURISDICTION** ................................................................................................. 1

**STANDARD OF REVIEW** .................................................................................. 2

**ISSUES ON APPEAL** ........................................................................................ 2

**STATEMENT OF THE CASE** ............................................................................ 3

**STATEMENT OF FACTS** ................................................................................... 3

    *A.*   *Background* ........................................................................................ 3

    *B.*   *Operative Facts* ................................................................................ 5

**ARGUMENT** ...................................................................................................... 10

  POINT I ........................................................................................................... 10

  *THE BANKRUPTCY COURT ERRED IN HOLDING THAT THERE WAS NO "EXERCISE OF A REMEDY" UNDER SECTION 15 OF THE LEASES* ................................. 10

  POINT II .......................................................................................................... 16

  *THE BANKRUPTCY COURT ERRED IN HOLDING THAT LONE STAR'S SALE OF ITS BENEFICIAL INTERESTS IN THE TRUST ESTATES – FOLLOWING DELTA'S LEASE DEFAULT AND THE INDENTURE TRUSTEE'S PURSUIT OF FORECLOSURE REMEDIES – WAS NOT "ATTRIBUTABLE" TO THE "EXERCISE OF A REMEDY" PURSUANT TO SECTION 15 OF THE LEASES* ................................................. 16

  POINT III ......................................................................................................... 19

  *THE BANKRUPTCY COURT ERRED IN DECLINING TO CONSIDER EXTRINSIC EVIDENCE IN INTERPRETING THE RELEVANT CONTRACTUAL LANGUAGE WHERE SUCH PROVISIONS WERE AMBIGUOUS ON THEIR FACE* ................................. 19

    *A.*   *Ambiguity of Section 7(a) Generally* ................................................. 19

    *B.*   *Ambiguity in the Phrase "Exercise of a Remedy" Within Section 7(a)* .................... 21

    *C.*   *Ambiguity in the Phrase "Attributable to" Within Section 7(a)* ................................ 23

**CONCLUSION** .................................................................................................. 24

# TABLE OF AUTHORITIES

Cases

*Albany Sav. Bank, F.S.B. v. Halpin*, 117 F.3d 669 (2d Cir. 1997) .......................................... 22, 23

*Bates v. Long Island Railroad Co.,* 997 F.2d 1028 (2d Cir. 1993), *cert. denied,* 510 U.S. 992 (1993) .................................................................................................................................... 12

*Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir. 1993) ............................ 22, 23

*Collins v. Harrison-Bode*, 303 F.3d 429 (2d Cir. 2002) ....................................................... 22, 23

*Finance One Publ. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325 (2d Cir. 2005) ...... 2

*Galli v. Metz*, 973 F.2d 135 (2d Cir. 1992) .................................................................................. 20

*Gouveia v. I.R.S. (In re Quality Health Care)*, 215 B.R. 543 (Bankr. N.D. Ind. 1997) ............... 15

*Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691 (2d Cir. 1998) ............................................ 22

*Hoffman v. Astroline Co. (Astroline Comm. Co., L.P.)*, 1996 WL 518506 (2d Cir. Sept. 13, 1996) ............................................................................................................................................ 2

*In re Delta Air Lines, Inc.*, 370 B.R. 552 (Bankr. S.D.N.Y. 2007) ....................................... 12, 14

*In re Delta Air Lines, Inc.*, No. 05-17923 (Bankr. S.D.N.Y. Jan. 16, 2008) (Decision on TIA/SLV Substitute Objection 3 and Objection 5I) ................................................................ 14

*In re Enron Creditors Recovery Corp.*, 370 B.R. 64 (Bankr. S.D.N.Y. 2007) ............................ 22

*In re U.S. Physicians Inc.*, 235 B.R. 367 (Bankr. E.D. Pa. 1999) *aff'd* 2002 WL 31866247 (E.D. Pa. Dec. 20, 2002); *aff'd* 2002 WL 32364524 (E.D. Pa. Dec. 20, 2002) ................................. 15

*In re Young*, 193 B.R. 620 (Bankr. D. Col. 1996) ....................................................................... 15

*In re Zaber*, 223 B.R. 102 (Bankr. N.D. Tex. 1998) ................................................................... 15

*Manley v. Ambase Corp.*, 337 F.3d 237 (2d Cir. 2003) ............................................................... 20

*Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805 (6th Cir. 2007) ............. 2

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pen. Plan*, 7 F.3d 1091 (2d Cir. 1993) ...... 22

*Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992) .............................. 22, 23

*U.S. v. West Productions, Ltd.*, 168 F. Supp.2d 84 (S.D.N.Y. 2001) .......................................... 12


Statutes

28 U.S.C. § 158(a)(1) (2008) ......................................................................................................... 1

I.R.C. § 1504(a) (1997) ................................................................................................................ 21


Other Authorities

Black's Law Dictionary (6th ed.) (1990) ..................................................................................... 15

## PRELIMINARY STATEMENT

This is an appeal by Lone Star Air Partners, Inc. ("Lone Star") from the Decision on TIA Transfer Objection 1, dated October 5, 2007 (D-3)[1] (the "Decision") and an Order with Respect to TIA Transfer Objection 1, dated October 22, 2007 (D-2) (the "Order") issued by Bankruptcy Judge Adlai S. Hardin, Jr. (the "Bankruptcy Judge") of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in connection with the chapter 11 proceedings of Delta Air Lines, Inc. ("Delta"). Pursuant to the Decision and Order, the Bankruptcy Court, in the context of a dispute arising out of a leveraged lease financing of several aircraft, disallowed Lone Star's contractual claims (the "Lone Star Claims") arising under certain Indemnity Agreements (D-4, Ex. A) ("TIAs") based upon the Bankruptcy Court's erroneous interpretation of the TIAs. Not only did the Bankruptcy Court misconstrue the language of the TIAs, but it did so without permitting Lone Star to introduce evidence with respect to the parties' original intent notwithstanding that the relevant contract language was ambiguous on its face. Accordingly, the Order should be reversed or, alternatively, remanded for further proceedings.

## JURISDICTION

On October 22, 2007, the Bankruptcy Court entered the Order disallowing and expunging the Lone Star Claims. The Order is a final order and, accordingly, this Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1) (2008).

---

[1]     "D-" refers to the documents enumerated in Appellant's Designation of Record [Docket No. 2].

## STANDARD OF REVIEW

The Bankruptcy Court correctly found that the "present dispute is one of contract interpretation . . . " Decision (D-3), at 8.  Accordingly, as a matter of law, the issues addressed herein are subject to *de novo* review by this Court.  See *Finance One Publ. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 339 (2d Cir. 2005) ("We review contract interpretation *de novo*."); *Hoffman v. Astroline Co. (Astroline Comm. Co., L.P.)*, 1996 WL 518506, at *2 (2d Cir. Sept. 13, 1996) ("In assessing a bankruptcy court's interpretation of a contract, we review its textual interpretation *de novo* . . . ."); *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 810 (6th Cir. 2007) ("[T]he determination of whether a contract is ambiguous, thereby making extrinsic evidence admissible for interpretive purposes, is a question of law and therefore subject to *de novo* review.").

## ISSUES ON APPEAL

1.      Whether the Bankruptcy Court erred as a matter of law in holding that the sale by Lone Star to an affiliate of Vx Capital Partners, LLC of Lone Star's beneficial interest in the trust estate was not the "exercise of a remedy" available to the Owner Participant pursuant to Section 15 of the Lease in response to the occurrence of Delta's Lease Event of Default.

2.      Whether the Bankruptcy Court erred as a matter of law in holding that Lone Star's sale of its beneficial interest in the trust estate following the occurrence of Delta's Lease Event of Default was not "attributable to" the exercise of a remedy under Section 15 of the Lease, within the meaning of Section 7(a) of the TIAs.

3.      Whether the Bankruptcy Court erred as a matter of law in declining to consider extrinsic evidence, where the TIAs are ambiguous on their face, with respect to (i) the meaning generally of Section 7(a) of the TIAs, (ii) the meaning in particular of the phrase "the exercise of

a remedy" as used in Section 7(a) of the TIAs, and (iii) the meaning in particular of the phrase "attributable to" as used in Section 7(a) of the TIAs.

## STATEMENT OF THE CASE

This appeal arises out the objection of Delta and the Post-Effective Date Committee (the "Committee") to the Lone Star Claims. The Bankruptcy Court conducted a hearing on September 7, 2007 (the "September 7 Hearing") and interpreted the relevant contractual provisions without permitting the introduction of extrinsic evidence even though the relevant contract provisions, on their face, are clearly ambiguous. Following the September 7 Hearing, the Bankruptcy Court issued the Decision and the Order, disallowing and expunging the Lone Star Claims. On October 31, 2007, Lone Star timely filed this appeal. Notice of Appeal of Lone Star Air Partners LLC of Order on TIA Transfer Objection 1 (D-1).

## STATEMENT OF FACTS

The facts relevant to this appeal generally are not in dispute, and may be summarized as follows:

### A.     *Background*

Delta and a number of its affiliates filed for chapter 11 bankruptcy relief on September 14, 2005. On May 25, 2007, Delta and the Committee filed TIA Transfer Objection 1: Objection by Delta Air Lines, Inc. and the Post-Effective Date Committee to Certain Claims Asserted by Lone Star for Tax Indemnities With Respect to Aircraft N636DL, N637DL, and N638DL (D-4) (the "Objection"), objecting to three claims – numbered 4933, 4948, and 4950 – filed by Lone Star. The Lone Star Claims seek compensation under the TIAs for tax losses arising as a result of Delta's defaults under the leases (D-4, Ex. H) (the "Leases") with respect to

the aircraft bearing U.S. registration or "tail" numbers N636DL, N637DL and N638DL (the "Aircraft"). Each TIA was part of a leveraged lease transaction evidenced by substantially identical documentation.

The Bankruptcy Court's Decision contains an accurate summary of the structure and basic documents for these transactions. *See* Decision (D-3), at 3-5. The salient facts are that Lone Star, as owner participant (the "Owner Participant"), was the beneficiary of three trusts, each of which owned one of the Aircraft and leased such Aircraft to Delta. The trustee of each trust was Wilmington Trust Company (the "Owner Trustee"). The related trust agreements required the Owner Trustee to follow the Owner Participant's instructions in matters relating to the transactions.

Each Aircraft originally was purchased with the proceeds of debt issued by the Owner Trustee and an "equity contribution" to the trust by the Owner Participant. In order to secure the debt, the Owner Trustee granted a mortgage on each Aircraft and a security assignment of each Lease with Delta to an indenture trustee (the "Indenture Trustee"), which at the times relevant here was Wells Fargo Bank Northwest, National Association, pursuant to a Trust Indenture and Security Agreement (the "Trust Indenture").

Both Delta and the Owner Participant entered into these transactions based on the assumption that each trust would be treated as a "grantor trust" for Federal income tax purposes, with the consequence that the Owner Trustee and the trust would be disregarded and the Owner Participant would be treated, for tax purposes, as the owner and lessor of the Aircraft. TIA (D-4, Ex. A), § 2 (a). As a result, the Owner Participant would be entitled to significant tax benefits arising out of the transaction, including accelerated depreciation or "cost recovery" deductions for the cost of each Aircraft and interest deductions with respect to the debt incurred by the

Owner Trustee. *Id.*, § 2(c).

As the Bankruptcy Court observed, the value of these tax benefits allowed the Owner Participant, through the trust structure, to lease the Aircraft to Delta at a lower price than otherwise would be available. *See* Decision (D-3), at 5. Several types of events could occur during the 22-year terms of the Leases, including an early termination because of Delta's bankruptcy and other defaults, that could cause the Owner Participant to "recapture" or lose the tax benefits that it had already received, which constituted a significant amount of the return that the Owner Participant had bargained for when entering into the transaction. *See, e.g.*, TIA (D-4, Ex. A), § 6(a) (detailing various events that could give rise to such a tax loss). To protect against these occurrences, the Owner Participant entered into the TIAs with Delta, which provided that Delta would indemnify the Owner Participant if, as a result of any act or omission by Delta, the Owner Participant incurred such a tax loss. *Id.*

## B.    *Operative Facts*

Delta's bankruptcy filing and its failure to make the rent payments required by the Leases constituted events of default under each of the Leases ("Lease Events of Default"). Leases (D-4, Ex. H), § 14(a) and (g). Those Lease Events of Default gave the Owner Trustee, as lessor, the right to exercise remedies pursuant to Section 15 of each Lease. *Id.*, § 15. Under the Trust Indenture, the Owner Trustee then granted all "rights, powers or remedies . . . arising out of any Lease Event of Default" to the Indenture Trustee, subject only to certain specified exceptions. One relevant exception was that the Indenture Trustee could not amend, modify or supplement the Lease in any significant way without the consent of both the Owner Trustee and the Owner Participant. Another relevant exception, the so-called equity squeeze provision, was that the Indenture Trustee could not "proceed to foreclose" the Lien of the Indenture unless it

simultaneously was "proceed[ing] (to the extent it ha[d] not already done so) to exercise one or more of the remedies referred to in Section 15 of the Lease (as it shall [have] determine[d] in its sole good faith discretion) . . . ." *See* Response (D-5), at 7.

On February 15, 2006, the Indenture Trustee and Delta, among others, entered into a Modified Restructuring Term Sheet (D-9, Ex. A) (the "Bingham Term Sheet"). Pursuant to the Bingham Term Sheet, the Indenture Trustee and Delta agreed to restructure the Leases in a manner that would violate the equity squeeze provisions of the Trust Indenture unless the Owner Trustee and the Owner Participant consented to the restructuring. Affidavit of David B. Gebler in Support of Surreply of Lone Star Air Partners LLC to TIA/SLV Transfer Objection 1 (D-9) (the "Gebler Affidavit"), at ¶ 5. The restructuring was to be completed "as soon as practical," and the parties agreed to use their reasonable best efforts to finalize the related documentation within six months of the Bankruptcy Court's approval of the Bingham Term Sheet, and in any event before the date of approval by the Bankruptcy Court of the disclosure statement for Delta's plan of reorganization. Bingham Term Sheet (D-9, Ex. A), at 8. The restructuring contemplated by the Bingham Term Sheet, among other things, eliminated the interests of the Owner Trustee and the Owner Participant under the Aircraft and the Leases, and established a formula for determining the Indenture Trustee's pre-petition damage claims under the Leases. Neither the Owner Trustee nor the Owner Participant ever consented to the terms of the restructuring. The Bingham Term Sheet acknowledged that such consents might be required, and that "the restructuring of certain Existing Transactions will have to be implemented after the interests of such owner trustees and owner participants have been foreclosed upon." *Id.* Delta agreed to cooperate as reasonably requested by the Indenture Trustee in any such foreclosure. *Id.*

Upon the Bankruptcy Court's approval, the Bingham Term Sheet became binding upon the Indenture Trustee and Delta, who then were obligated to carry out its terms. As a result of the approval of the Bingham Term Sheet, Lone Star knew that the Indenture Trustee had entered into a binding agreement that would require it to foreclose on the Aircraft and Leases in the near future. Gebler Affidavit (D-9), at ¶ 3-5. Not long thereafter, on March 19, 2006, the parties holding the outstanding debt on the Aircraft (the "Debtholders") asked Lone Star if it would be willing either to buy the debt or to consummate a consensual foreclosure. *Id.*, at ¶¶ 6, 12 .

When Lone Star and the Debtholders were unable to reach agreement, the Indenture Trustee (acting on behalf of the Debtholders) served written notice on May 26, 2006 that it had elected to foreclose upon Lone Star's interest in two of the Aircraft, together with the related Leases and other property and interests pledged under the Trust Indentures, and auction the same to the highest bidder on June 29, 2006, with an auction of the third Aircraft, Lease and related property to follow soon afterwards. Gebler Affidavit (D-9), at ¶ 8.

In response to the pending foreclosures, Lone Star had attempted to find possible buyers who would actively participate in the auctions to ensure that the bids would be as high as possible. Gebler Affidavit (D-9), at ¶ 7. As a result of such efforts, Lone Star identified Vx Capital Partners, LLC (together with its affiliate, V20D-757X3, LLC, "Vx") as the probable highest bidder, and Vx asked Lone Star to "lock in" the proposed purchase price for the Aircraft by selling Lone Star's interests in the three trusts to Vx, contingent upon the Debtholders' agreeing to a purchase of their debt at par. *Id.*, at ¶¶ 10-11. This way Vx either could pay off the debt at par prior to the auction and retain the Aircraft or, if the auction proceeded, Vx (as the new owner participant) could either bid the highest price for the Aircraft or allow the Aircraft to be

sold to another bidder; in either event, Vx (as the new owner participant) would receive any excess of the purchase price over the debt amount because the Trust Indenture required such excess to be paid back to the Owner Trustees, who then were required by the trust agreements to distribute such amounts to the owner participant.

While the transaction described above was being documented, the Debtholders informed Lone Star that they would not agree to a purchase of their debt at par, and as a result, Lone Star and Vx postponed their transaction. The Debtholders also postponed the foreclosure and auction date to see if they could reach an agreement with Lone Star about a premium. Gebler Affidavit (D-9), at ¶¶ 12-16. No agreement was reached, and on July 17, 2006 the Indenture Trustee held a public foreclosure auction with respect to two of the Aircraft – tails N637DL and N638DL.[2] *Id.*, at ¶¶ 17-20. Vx was the winning bidder and, subject to its delivery of satisfactory sales documentation, was entitled to purchase the Aircraft. *Id.*, at ¶ 20.

The Debtholders then threatened to forego the sale to Vx unless Lone Star agreed to pay the premium they demanded. Gebler Affidavit (D-9), at ¶ 23. Lone Star and Vx eventually reached another agreement pursuant to which Lone Star would sell its Owner Participant's interests in the trusts holding all three Aircraft to Vx, and the sale was consummated on October 19, 2006 (the "Sale"). *Id.*, at ¶¶ 25-26.

Lone Star incurred various tax losses as a result of the Sale, aggregating in excess of $15,635,813, for which it seeks indemnification under the TIAs. *See* Proof of Claim for N636DL (D-4, Ex. B); Proof of Claim for N637DL (D-4, Ex. C); Proof of Claim for N637DL (D-4, Ex. D). The amount of Lone Star's tax losses greatly exceeds its proceeds from the Sale,

---

[2]     Tail number N636DL was never auctioned but, as indicated above and as required by the Bingham Term Sheet, the Debtholders informed Lone Star that they expected to pursue a similar course of action with respect to that Aircraft.

which proceeds in any event represented the excess of the fair market value of the Aircraft, which beneficially belonged to Lone Star, over the outstanding debt, and not any compensation for Lone Star's tax losses. Lone Star would have incurred approximately the same amount of tax loss if, instead of selling its beneficial interest in the trusts to Vx, it had purchased the debt and caused the Owner Trustee, which then would be able to exercise remedies under Section 15 of the Lease, to sell the Aircraft to Vx. Transcript of September 7 Hearing (D-10), at 67-68. Lone Star also would have incurred approximately the same amount of tax loss if, instead of selling its beneficial interest in the trust to Vx, the Indenture Trustee had consummated the pending foreclosure and sale to Vx. *Id.*, at 66-67. Delta acknowledged at the September 7 Hearing that Delta would have been required to indemnify Lone Star under the TIAs for its tax loss if the Sale had taken either of these latter forms. *Id.*, at 10, 72. Delta maintained, however, that because the Sale took the form of a sale of Lone Star's beneficial interest in the trust, rather than an outright sale of the Aircraft by the Owner Trustee or a foreclosure sale by the Indenture Trustee, Delta was relieved of its indemnity obligations. *Id.* When questioned, Delta was unable to explain why the parties would have intended such an elevation of form over substance, especially of an indemnity agreement. *Id.*

Delta has not disputed that events giving rise to the Sale – the bankruptcy of Delta and the restructuring agreement reached by Delta with the Indenture Trustee, as memorialized in the Bingham Term Sheet, which mandated foreclosure absent consent by the Owner Participant to an elimination of its interest – were "acts or omissions" by Delta as required by the TIAs as a condition precedent to Delta's obligation to indemnify Lone Star. TIA (D-4, Ex. A), § 6(a). Rather, Delta argued that its indemnity obligation is not applicable because of an exclusion that applies unless the Sale "is attributable to the exercise of a remedy available to the Owner

Participant pursuant to Section 15 of the Lease in response to the occurrence of [Delta's] Lease

Event of Default." TIA (D-4, Ex. A), § 7(a). The Bankruptcy Court agreed with Delta that, prior

to the sale, there had been no exercise of remedies under the Leases and that even if there had

been, the Sale was not "attributable" to any "attempted, aborted or other exercise of a remedy,"

but rather was a voluntary sale motivated solely by Lone Star's desire to ensure the best sales

price for the Aircraft and to avoid paying the premium demanded by the Debtholders. *See*

Decision (D-3), at 10-14. Thus, according to the Bankruptcy Court, the Owner Participant's Sale

was purely voluntary and not attributable to Delta's Lease Events of Default or to any remedial

action taken in connection therewith.

## ARGUMENT

### POINT I

### THE BANKRUPTCY COURT ERRED IN HOLDING THAT THERE WAS NO "EXERCISE OF A REMEDY" UNDER SECTION 15 OF THE LEASES

It is undisputed that at the time of the Sale, a Lease Event of Default had occurred

and was continuing by reason of Delta's acts or omissions and, therefore, that the first condition

precedent to Delta's indemnity obligations under the TIAs had been met. Decision (D-3), at 10.

It also is undisputed that prior to the Sale, (i) the Indenture Trustee entered into the Bingham

Term Sheet which, after its approval by the Bankruptcy Court, obligated the Indenture Trustee to

foreclose upon the Aircraft and the Leases, given that Lone Star had not consented (and had

informed the Indenture Trustee that it would not consent) to the restructuring, and (ii) the

Indenture Trustee took affirmative steps to comply with its foreclosure obligations by (a)

providing Lone Star with actual notice of the foreclosure and auction of the Aircraft, including

the date set therefor, (b) publishing notice of the auction publicly and registering bidders who

responded, (c) conducting a foreclosure auction with respect to two of the Aircraft to determine the highest bidder at the auction, and (d) advising Lone Star that it would do the same with respect to the third Aircraft, as required by the Bingham Term Sheet.

Lone Star argued below that the Indenture Trustee first exercised remedies under the Leases by entering into the Bingham Term Sheet.  Transcript of September 7 Hearing (D-10), at 43.  As mentioned above, the equity squeeze provisions of the Trust Indenture prohibited the Indenture Trustee from proceeding to foreclose the Lien of the Indenture, *unless it was simultaneously proceeding (to the extent that it had not already done so) to exercise one or more remedies under the Lease.*  Response (D-5), at 7 (citing equity squeeze provisions).  Hence, unless Lone Star is correct that the Bingham Term Sheet was an exercise of remedies under the Leases, all of the actions that the Indenture Trustee took in furtherance of foreclosure violated the provisions of the Trust Indenture.

As Lone Star noted in its Surreply, Delta previously had asserted and argued vociferously before the Bankruptcy Court that the equity squeeze provisions of the leases had not been violated precisely because the Indenture Trustee's entry into the Bingham Term Sheet was an exercise of remedies under Section 15(f) of the Lease. *See* Surreply of Lone Star Air Partners LLC to TIA Transfer Objection 1 (D-8) (the "Surreply"), at 2-3.  Section 15(f) of the Leases provides that among the lessor's remedies is "the exercise of any other right or remedy which may be available under applicable law or *proceed[ing] by appropriate court action* to enforce the terms [of the Lease] or *to recover damages for the breach hereof.*"  Lease (D-4, Ex. H) (emphasis supplied).  Delta also has argued repeatedly and successfully in the context of Delta's TIA/SLV Objections 1 and 2 before the Bankruptcy Court that by entering into the Bingham Term Sheet, which established the methodology for calculating the Indenture Trustees' claims

for pre-petition damages under the Leases, the Indenture Trustee properly was exercising its rights under Section 15(f).[3] Surreply (D-8), at 2-3. The Bankruptcy Court dismissed Lone Star's objections to Delta's subsequent reversal of its position in the instant case. Decision (D-3), at 11, n.7; *but see U.S. v. West Productions, Ltd.*, 168 F. Supp.2d 84, 88-90 (S.D.N.Y. 2001) (discussing the doctrine of judicial estoppel as applied in the Second Circuit, which prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by such a party in a prior legal proceeding) *citing Bates v. Long Island Railroad Co.*, 997 F.2d 1028 (2d Cir. 1993), *cert. denied,* 510 U.S. 992 (1993). As Delta now takes a factual position that is inconsistent with its positions taken before the Bankruptcy Court on TIA/SLV Objections 1 and 2, and as its prior positions were adopted by the Bankruptcy Court in its discussions on those Objections, the predicates for application of the doctrine of judicial estoppel have been met. *Id.* In addition to preserving the integrity of the judicial system, Delta should be judicially estopped from making inconsistent statements in this proceeding in order to avoid the risk of inconsistent results among the various Delta proceedings.

Notwithstanding the foregoing, the Bankruptcy Court dismissed Lone Star's arguments that by entering into the Bingham Term Sheet, the Indenture Trustee had exercised remedies under the Lease. Decision (D-3), at 11. In doing so, the Bankruptcy Court downplayed the significance of the Bingham Term Sheet stating that it created the "mere *expectation* of the

---

[3]     Indeed, the Bankruptcy Court itself previously held that an indenture trustee's mere filing of a proof of claim constituted the exercise of a remedy under the lease. *In re Delta Air Lines, Inc.*, 370 B.R. 552, 558 (Bankr. S.D.N.Y. 2007) ("Nor is there any dispute that the indenture trustee as assignee of the lessor has invoked its rights under Section 15(e) of the Lease by demanding that debtor pay Stipulated Loss Value under the Lease. The indenture trustee's claim filed in the bankruptcy includes an amount calculated in accordance with Stipulated Loss Value . . . ."). Accordingly, the Indenture Trustee also exercised remedies under the Lease when it filed its claim on or before August 21, 2006, the claims bar date in this case, well before the Sale occurred on October 19, 2006.

exercise of a remedy" and "contemplated the *future* exercise of a remedy . . . when there would

be a *future* foreclosure on the aircraft." *Id.*, at 11.  In fact, the Bankruptcy Court's approval of

the Bingham Term Sheet, by its own terms, created a binding obligation on the part of the

Indenture Trustee to perform its agreement with Delta, which because Lone Star refused to

consent to the elimination of its interest that the restructuring involved, virtually guaranteed a

foreclose in the near future.

   The Bankruptcy Court offered little analysis or explanation for its holding, other

than to note that "the Indenture Trustee's authority to enter into the restructuring agreement did

not derive from the remedies section of the Leases but rather from the inherent power of any

party to contractual arrangements to renegotiate the terms of those arrangements." *Id.*  The

Bankruptcy Court apparently overlooked the fact that the Indenture Trustee was not a party to

the Leases but only an assignee for security purposes of the Owner Trustee's rights as lessor

under the Leases.  As such, it had only those rights with respect to the Leases that were specified

in the Trust Indentures and those rights were limited by Section 8.01(e) of the Trust Indenture

which precluded the restructuring contemplated by the Bingham Term Sheet without the Owner

Participant's consent.  Response (D-5), at 7.

   Moreover, it defies logic to suggest that the Indenture Trustee was not exercising

remedies under the Leases when it entered into the Bingham Term Sheet.  A major purpose of

the Bingham Term Sheet was to establish the methodology for the calculation of the claims of

the Indenture Trustee, as the lessor's assignee, against Delta under the Leases.  Bingham Term

Sheet (D-9, Ex. A), at 2-3.  The Bankruptcy Court repeatedly has stated its view that the

allowance of such claims, as calculated pursuant to the Bingham Term Sheet, and Delta's

subsequent distributions thereon, will constitute the payment of Stipulated Loss Value under the

Leases for purposes of interpreting other provisions of the TIAs. *See, e.g., In re Delta Air Lines, Inc.*, 370 B.R. 552, 559 (Bankr. S.D.N.Y. 2007); *In re Delta Air Lines, Inc.*, No. 05-17923, at 10 (Bankr. S.D.N.Y. Jan. 16, 2008) (Decision on TIA/SLV Substitute Objection 3 and Objection 5I). In any event, it is undisputed that the Bingham Term Sheet sets forth the calculation of the Indenture Trustee's pre-petition damage claims under the Leases pursuant to its agreement with Delta (whether or not the Bankruptcy Court's interpretation of this amount as constituting SLV is upheld on appeal) and was approved by the Bankruptcy Court on February 15, 2006. These actions clearly constitute a "proceed[ing] by appropriate court action . . . to recover damages for the breach [of the Lease]" and thus, an exercise of remedies under Section 15(f) of the Lease.

The Bankruptcy Court also rejected Lone Star's argument that the actions taken by the Indenture Trustee in furtherance of the Bingham Term Sheet – giving Lone Star notice of the foreclosure, publishing notice publicly, registering bidders and actually conducting an auction to determine the highest bidder, as described in the Gebler Affidavit – constituted an exercise of remedies under the Leases. Decision (D-3), at 11-12. According to the Bankruptcy Court, "[m]erely giving notice of an intent to sell, or even holding an unconsummated auction is not the same thing as selling the planes." *Id.,* at 12. Of course, the requirement of Section 7(a) of the TIAs is not that the Indenture Trustee actually sell the Aircraft, but rather that the sale by the Owner Participant be attributable to an "exercise of remedies pursuant to Section 15 of the Lease . . . ." If these actions by the Indenture Trustee were not taken pursuant to Section 15 of the Lease, then one wonders what authority the Indenture Trustee had to take such actions, and again, whether the Indenture Trustee violated the equity squeeze provisions of the Trust Indenture.

In Lone Star's view, the Indenture Trustee took these actions pursuant to Section 15(b) of the Leases, which allows the lessor to elect "with or without taking possession thereof, [to] sell or otherwise dispose of the Aircraft . . . at public or private sale and with or without notice to Lessee or advertisement . . . ." Clearly, the actions taken by the Indenture Trustee were part of the activity of selling the Aircraft. As Lone Star pointed out to the Bankruptcy Court, there is no requirement that the sale be consummated in order for actions to constitute an "exercise of remedies" within the meaning of TIA Section 7(a). Transcript of September 7 Hearing (D-10), at 49-50.

While there is little case law directly on point, what precedent does exist supports Lone Star's view that the term "exercise" is broad enough to encompass actions taken toward a particular end, even if that end has not yet been fully achieved. *See, e.g., Gouveia v. I.R.S. (In re Quality Health Care)*, 215 B.R. 543, 573 (Bankr. N.D. Ind. 1997) ("As the Webster's definition indicates, the word exercise connotes the positive acts of bringing into play, making effective in action, bringing to bear, exerting."); *In re U.S. Physicians Inc.*, 235 B.R. 367, 375 (Bankr. E.D. Pa. 1999) *aff'd* 2002 WL 31866247 (E.D. Pa. Dec. 20, 2002) *aff'd* 2002 WL 32364524 (E.D. Pa. Dec. 20, 2002); *In re Young*, 193 B.R. 620 (Bankr. D. Col. 1996); *see also In re Zaber*, 223 B.R. 102 (Bankr. N.D. Tex. 1998). Similarly, Black's Law Dictionary defines "exercise" as follows:

> **Exercise.** To make use of. Thus, to exercise a right or power is to *do something* which it enables the holder to do; *e.g.*, exercising option to purchase stock.
>
> To *put in action* or practice, to carry on something, to transact or execute.

Black's Law Dictionary (6th ed.) 572 (1990) (emphasis supplied).

Thus, under these authorities, the Indenture Trustee clearly exercised a remedy under Section 15(b) of the Leases because it "made use of" its right to bring about a sale of the Aircraft and in fact "took positive acts" in an effort to bring about such sale. Accordingly, the

Bankruptcy Court's holding that there was no "exercise of a remedy" under Section 15 of the Leases is artificially narrow and should be reversed; both the Indenture Trustee's entry into the Bingham Term Sheet and the subsequent acts that it took in furtherance of its foreclosure obligations, all of which occurred prior to the Sale, were exercises of remedies under the Leases.

**POINT II**

**THE BANKRUPTCY COURT ERRED IN HOLDING THAT LONE STAR'S SALE OF ITS BENEFICIAL INTERESTS IN THE TRUST ESTATES – FOLLOWING DELTA'S LEASE DEFAULT AND THE INDENTURE TRUSTEE'S PURSUIT OF FORECLOSURE REMEDIES – WAS NOT "ATTRIBUTABLE" TO THE "EXERCISE OF A REMEDY" PURSUANT TO SECTION 15 OF THE LEASES**

The Bankruptcy Court also held that Lone Star's sale of its interests was not "attributable" to the Indenture Trustee's actions in exercise of its remedies under Section 15 of the Leases, but rather to its desire to monetize its interest through a sale to the highest bidder and avoid the premium demanded by the Debtholders. Decision (D-3), at 13-14.

This finding is clearly contradicted by the facts detailed in the Gebler Affidavit, which are not disputed. Lone Star undertook the actions which ultimately resulted in the Sale only after becoming aware that Indenture Trustee and Delta had entered into the Bingham Term Sheet and that foreclosure by the Indenture Trustee was required by the Bingham Term Sheet in the near future. Gebler Affidavit (D-9), at ¶¶ 3-7. Lone Star's first action in response to this knowledge, other than discussing possible alternatives to foreclosure with the Debtholders, was to find buyers to participate in the auction, not to sell its interests to such buyers. *Id.*, at ¶ 7. The Sale was consummated on October 19, 2006, eight months after the Bingham Term Sheet was approved, and only after extensive negotiations with the Debtholders regarding a purchase of the debt or a consummation of the foreclosure auction had broken down. *Id.*, at ¶¶ 8-25.

Although Lone Star realized that the Bingham Term Sheet required the Indenture Trustee eventually to foreclose on the Aircraft and Leases, with Delta's cooperation pursuant to the terms of the Bingham Term Sheet, the Indenture Trustee could delay foreclosure and allow interest on the debt to accrue, at the default rate, and thereby diminish the value of the Owner Participant's residual interest, in an attempt to pressure the Owner Participant into paying a premium upon foreclosure that was not required by the Trust Indenture. *Id.* In light of these circumstances, the Owner Participant looked at its economic alternatives and chose the best option available to it – a sale to Vx that would stop the hemorrhaging of value from its assets.

The Bankruptcy Court's conclusion, based on these facts, that this was a "voluntary decision" and that "Lone Star, not Delta, should bear the economic consequences resulting from its decision" is unfathomable. Decision (D-3), at 14. Delta's Lease Events of Default were the sole basis upon which the Indenture Trustee could take such actions against the Owner Participant's beneficial interest in the Aircraft and the Lease. Once Delta and the Indenture Trustee entered into the Bingham Term Sheet, it was clear that the Owner Participant's interest in these assets would be extinguished – either through its consent to the restructuring or by foreclosure, absent such consent. In either scenario, the Owner Participant not only would lose its ownership of the Aircraft and future payments of rent to it in excess of debt service, but also would incur a tax loss. The causal connection between Delta's actions, the Indenture Trustee's actions and Lone Star's Sale could not be more clear. This was precisely the situation that the TIA was intended to address, by at least giving the Owner Participant a claim against Delta for its tax loss when Delta's acts or omissions resulted in a Lease Event of Default and the resulting Sale by the Owner Participant was attributable to an exercise of remedies under Section 15 of the Lease in response to such Event of Default.

Finally, Debtors' counsel argued, and the Bankruptcy Court seemingly agreed, that the words "attributable to" were used by the parties to mean "pursuant to," with the intent that the sale or disposition at issue must be made pursuant to an exercise of remedies under Section 15 of the Lease in order to allow indemnification. Post-Hearing Statement of Lone Star in Further Support of Response to TIA Transfer Objection 1 (D-11) ("Post-Hearing Statement"), at ¶ 7; Decision (D-3), at 11. The parties, however, did not simply say "and such sale or disposition is pursuant to Section 15 of the Lease"; rather, they wrote "and such sale or disposition is *attributable* to the exercise of a remedy *available* to the Owner Participant pursuant to Section 15 of the Lease in response to the occurrence of such Event of Default." TIA (D-4, Ex.A), § 7(a) (emphasis supplied).

The word "attributable" derives from the verb "attribute," which is defined by Merriam Webster Dictionary, in pertinent part, to mean "to explain by indicating a cause <*attributed* his success to his coach> . . . ." This definition demonstrates that the parties could have intended (and we submit did intend) indemnification to apply whenever there was a causal connection between the sale or disposition and an exercise of remedies. The language at the end of the provision, "in response to the occurrence of such Event of Default," supports this view. Certainly the parties could have used the words "pursuant to," rather than "attributable to," to refer to the sale if that was what they intended, as the operative documents contain numerous uses of the words "pursuant to." Indeed, in Section 7(a) itself, the parties used the words "pursuant to" to reference the remedies available under the Lease, but chose the words "attributable to" to indicate that the sale or disposition need only be "attributable to" such an exercise.

Accordingly, the Bankruptcy Court erred in holding that Lone Star's sale of its beneficial interests in the Trust Estates was not "attributable" to the exercise of a remedy pursuant to Section 15 of the Leases.

**POINT III**

**THE BANKRUPTCY COURT ERRED IN DECLINING TO
CONSIDER EXTRINSIC EVIDENCE IN INTERPRETING THE
RELEVANT CONTRACTUAL LANGUAGE WHERE SUCH
PROVISIONS WERE AMBIGUOUS ON THEIR FACE**

In disallowing and expunging the Lone Star Claims, the Bankruptcy Court predicated its holding upon its own interpretation of Section 7(a) of the TIAs and Section 15 of the Leases without permitting the introduction of extrinsic evidence as to the meaning of those sections. This was clear error in that those provisions are ambiguous on their face and were reasonably subject to differing interpretations. Had the Bankruptcy Court afforded Lone Star the opportunity to introduce extrinsic evidence, Lone Star submits that such evidence would have demonstrated that the parties intended for Delta to indemnify Lone Star for its tax losses upon the Sale of its interest under the facts of this case.

*A.*     ***Ambiguity of Section 7(a) Generally***

As Lone Star argued below, a simple reading of the provisions of Section 7(a) of the TIAs clearly demonstrates that such provisions are ambiguous and, as such, extrinsic evidence should have been considered in determining their meaning. *See* Response (D-6), at 2-5; Post-Hearing Statement (D-11), at ¶¶ 1-4, 7.

The exclusion of Section 7(a) requires that the relevant sale or disposition of the Aircraft by the Owner Participant be "attributable to the exercise of a remedy *available to the Owner Participant pursuant to Section 15 of the Lease . . . .*" TIA (D-4, Ex. A), § 7(a) (emphasis

supplied).  On its face, this provision is ambiguous because the Owner Participant is *not even a party* to the respective Leases and, therefore, no remedy pursuant to the Lease is ever "available to the Owner Participant." *Id.*  Clearly, the parties did not intend for this provision be meaningless and the Court should not interpret a provision such as this in a manner that would make it meaningless.  *See* Response (D-5), at 2-5; *Manley v. Ambase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) ("New York law . . . disfavors interpretations that render contract provisions meaningless or superfluous."); *Galli v. Metz*, 973 F.2d 135, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'").

In order to ascertain the meaning of Section 7(a) the Bankruptcy Court should have considered testimony as to what the parties actually intended; however, the Bankruptcy Court specifically declined to consider extrinsic evidence.  Transcript of September 7 Hearing (D-10), at 109-10.  Notwithstanding Section 7(a)'s clear ambiguity, the Bankruptcy Court held that it was unambiguous.  Decision (D-3), at 14.  Equally baffling was the Bankruptcy Court's determination that "even if it were incoherent, the appropriate solution would be to substitute the phrase 'Owner Trustee or Indenture Trustee' for the term 'Owner Participant' to give effect to the drafters' clear intent . . . ."  Decision (D-3), at 10, n.5.  Essentially, what the Bankruptcy Court did was to substitute its own unsupported opinion about what the parties must have intended, rather than to hear from witnesses who were participants in the drafting of the operative documents as to their actual intent.  The Bankruptcy Court's refusal to accept extrinsic evidence with respect to the meaning of Section 7(a) constitutes reversible error.

Moreover, the Bankruptcy Court's predicate for its determination was incorrect.  The Bankruptcy Court accepted Delta's argument that references in Section 7(a) to the Owner

Participant were intended to encompass the Owner Trustee because Section 11 of the TIAs states

that the term "Owner Participant" includes the affiliated group for tax purposes of which the

Owner Participant is a member, and the Owner Trustee also is a member of that group. *See*

Transcript of September 7 Hearing (D-10), at 24-25; Decision (D-3), at 10, n.5. This argument,

however, ignores the fact that, as Lone Star previously pointed out, the Owner Trustee is not a

member of the Owner Participant's affiliated group and, therefore, Section 11 (or 12 in certain

TIAs) cannot be relied upon to resolve the ambiguities of Section 7(a). *See* I.R.C. § 1504(a)

(1997); Post-Hearing Statement, at ¶¶ 1-3.

**B.      *Ambiguity in the Phrase "Exercise of a Remedy" Within Section 7(a)***

          Another provision in Section 7(a) of the TIAs that is ambiguous is the language

that requires any sale or disposition to be attributable to the "exercise of a remedy" under Section

15 of the Lease.  As Lone Star argued before the Bankruptcy Court, it believes that each of the

(i) entry into the Bingham Term Sheet and (ii) the actions taken by the Indenture Trustee to

auction the Aircraft (even though the sale of the Aircraft pursuant to the auction was not

consummated) was an "exercise of remedies" under Section 15 of the Lease.  Transcript of

September 7 Hearing (D-10), at 37.  The discussion set forth above demonstrates that Lone

Star's arguments are well supported by the relevant contract provisions and case law. *Id*.  Delta

argued to the contrary, and the Bankruptcy Court agreed, that only a consummated sale or other

disposition of the Aircraft could constitute an "exercise of remedies" within the meaning of

Section 7(a). Decision (D-3), at 11.

          Second Circuit authority dictates that an agreement is ambiguous when it is

"capable of more than one meaning when viewed objectively by a reasonably intelligent person

who has examined the context of the entire integrated agreement and who is cognizant of the

customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pen. Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993); *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998) ("Once a contract is found to be ambiguous, a court must examine ambiguous terms from the vantage point of the reasonable expectations and purposes of the ordinary person, and should consider extrinsic evidence of the parties' intentions.") (internal quotations and citations omitted); *In re Enron Creditors Recovery Corp.*, 370 B.R. 64, 71-71 (Bankr. S.D.N.Y. 2007) ("If a contract is unambiguous, courts should preclude extrinsic evidence of the contract's purpose. However, where a contract is ambiguous, extrinsic evidence, including evidence of industry custom or practice, may be considered to determine the parties' intent.") (internal citations omitted). In light of this authority and the fact that the term "exercise" was subject to two plausible meanings, the Bankruptcy Court was obligated to consider extrinsic evidence in determining the appropriate meaning. In fact, extrinsic evidence of whether the Indenture Trustee considered itself to be exercising remedies under the Lease when it took the actions at issue, and if not, what basis existed under the documents for such actions, would have been very helpful to the Bankruptcy Court in accurately resolving this issue. Failure to do so constitutes reversible error. *See, e.g., Collins v. Harrison-Bode*, 303 F.3d 429, 434 (2d Cir. 2002) (remanding to allow the parties to present extrinsic evidence); *Albany Sav. Bank, F.S.B. v. Halpin*, 117 F.3d 669, 673-74 (2d Cir. 1997) (reversing and remanding decision to the district court to consider extrinsic evidence); *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (same); *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 430 (2d Cir. 1992) (same).

**C.**     *Ambiguity in the Phrase "Attributable to" Within Section 7(a)*

Yet another provision in Section 7(a) of the TIAs that is ambiguous is the language that requires any sale or disposition to be "attributable to" the exercise of a remedy under Section 15 of the Lease.  Delta argued that the term "attributable to" in this context is synonymous with the term "pursuant to."  Lone Star argued, as described above, that the term "attributable to" has a broader meaning in this context, to indicate a causal connection or motivating influence.  Extrinsic evidence of what precisely the parties intended by the use of this term also would have been helpful in resolving this issue.  As the ambiguity is obvious, the Bankruptcy Court was obligated by the same authority cited in Section III.B above to consider extrinsic evidence in determining the appropriate meaning of the phrase "attributable to," and its failure to do so constitutes reversible error.  *See, e.g.*, *Collins v. Harrison-Bode*, 303 F.3d at 434; *Albany Sav. Bank, F.S.B. v. Halpin*, 117 F.3d at 673-74; *Brass v. American Film Technologies, Inc.*, 987 F.2d at 150; *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d at 430.

*[remainder of page intentionally left blank]*

## CONCLUSION

For the foregoing reasons, the Order of the Bankruptcy Court should be reversed or, in the alternative, remanded for further proceedings.

Dated: New York, New York
      January 17, 2008

KAYE SCHOLER LLP

*[signature]*

Richard G. Smolev (RS 2222)
Piper A. Brock (PB 6335)
425 Park Avenue
New York, New York 10022
(212) 836-8000 (telephone)
(212) 836-8689 (facsimile)

*Counsel for Appellant*
*Lone Star Air Partners LLC*