**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                    :

**LONE STAR AIR PARTNERS, LLC**    :
                    :

           **Appellant,**    :   **Civil Case No. 07-CV-11143 (SAS)**
                    :   **(ECF Case)**

        **-against-**    :
                    :

**DELTA AIR LINES, INC. and THE POST-**  :
**EFFECTIVE DATE COMMITTEE,**    :
                    :

        **Appellees.**    :

-------------------------------------------------------------x


## BRIEF ON APPEAL OF APPELLEES DELTA AIR LINES, INC. AND THE POST-EFFECTIVE DATE COMMITTEE

DEBEVOISE & PLIMPTON LLP
Michael E. Wiles
Richard F. Hahn
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:   (212) 909-6836

*Special Aircraft Attorneys for Reorganized Debtors*

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden (DG-5624)
David H. Botter (DB-2300)
Mitchell P. Hurley (MH-0740)
590 Madison Avenue
New York, NY 10022
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel for the Post-Effective Date Committee*

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ................................................................................................ii

**PRELIMINARY STATEMENT** ........................................................................................ 1

**STATEMENT OF BASIS OF APPELLATE JURISDICTION**............................................. 3

**COUNTER-STATEMENT OF ISSUE PRESENTED** ............................................................ 4

**APPLICABLE STANDARD OF APPELLATE REVIEW** .................................................... 4

**STATEMENT OF FACTS**.................................................................................................. 4

     **A.**     **Leveraged Leases and the Lone Star Transactions** ........................................ 4

     **B.**     **The Lone Star Claims**........................................................................................ 5

     **C.**     **Lone Star's Sale of its Interests in the Trust Estates**..................................... 6

**STATEMENT OF THE CASE**............................................................................................ 8

**ARGUMENT**.................................................................................................................. 12

**I.**     **THE BANKRUPTCY COURT CORRECTLY HELD THAT THE SALE OF
LONE STAR'S INTERESTS IN THE TRUST ESTATES WAS NOT
"ATTRIBUTABLE TO THE EXERCISE OF A REMEDY" UNDER
SECTION 15 OF THE LEASES** ................................................................... 12

**II.**     **NO SALE REMEDY WAS EXERCISED UNDER THE LEASES, AND
LONE STAR'S ARGUMENTS ABOUT OTHER POSSIBLE EXERCISES
OF REMEDIES ARE IRRELEVANT AND/OR INACCURATE**............................ 18

**III.**     **THE BANKRUPTCY COURT CORRECTLY HELD THAT THE
CONTRACTUAL LANGUAGE WAS NOT AMBIGUOUS** ..................................... 21

**CONCLUSION** .............................................................................................................. 24

22667720v10

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Alstrin v. St. Paul Mercury Ins. Co.*,
179 F. Supp. 2d 376 (D. Del. 2002) ...................................................................14

*Bethlehem Steel Co. v. Turner Construction Co.*,
2 N.Y.2d 456 (1957) ........................................................................................22

*Breed v. Ins. Co. of N. Am.*,
46 N.Y.2d 351 (1978) ......................................................................................22

*Galli v. Metz*,
973 F.2d 145 (2d Cir. 1992) ............................................................................16

*Greenfield v. Philles Records, Inc.*,
98 N.Y.2d 562 (2002) ................................................................................22, 23

*Hotchkiss v. Nat'l City Bank of New York*,
200 F. 287 (S.D.N.Y. 1911) ............................................................................23

*In re Enron Corp.*,
364 B.R. 482 (S.D.N.Y. 2007) ..........................................................................4

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
906 F.2d 884 (2d Cir. 1990) ............................................................................22

*Mulack v. Hickory Hills Police Pension Bd.*,
252 Ill. App. 3d 1063 (1st Dist. 1993) .............................................................14

*Ogle v. Superior Court*,
4 Cal. App. 4th 1007 (5th Dist. 1992) ..............................................................14

*Skycom Corp. v. Telstar Corp.*,
813 F.2d 810 (7th Cir. 1987)............................................................................23

### **Statutes and Rules**

28 U.S.C. § 158(a)(1).........................................................................................3

Fed. R. Bankr. P. 8001 .......................................................................................3

Fed. R. Bankr. P. 8013........................................................................................4

22667720v10

**<u>Other</u>**

OXFORD ENGLISH DICTIONARY (2d ed. 1989)..................................................................................13

Appellees Delta Air Lines, Inc. ("**Delta**") and the Post Effective Date Committee (the "**Committee**") submit this brief in response to the brief (the "**Lone Star Br**.") filed by Lone Star Air Partners, LLC ("**Lone Star**") in support of its appeal (the "**Appeal**") from the Order with Respect to TIA Transfer Objection 1 (the "**Order**") entered by the Bankruptcy Court for the Southern District of New York on October 22, 2007 [D 2].[1]

## PRELIMINARY STATEMENT

This Appeal arises out of tax-driven "leveraged lease" financings relating to the acquisition of three aircraft. In those financings, Lone Star established trusts to own certain aircraft (the "**Owner Trusts**"), and the Owner Trusts borrowed funds to assist in financing their acquisition of the aircraft. Delta then entered into leases with the Owner Trusts ("**Leases**"), and the Owner Trusts assigned the Leases to the indenture trustees ("**Indenture Trustees**") who acted as collateral trustees for the lenders. In the event of a default, the Leases entitled the Owner Trusts (or the Indenture Trustees as assignees) to pursue certain remedies, including the right to sell the aircraft.

Delta also entered into tax indemnity agreements ("**TIAs**") with Lone Star in connection with the leveraged lease transactions. In the TIAs, Delta agreed to compensate Lone Star if Lone Star incurred certain kinds of tax losses, but only if those losses arose from specific events and circumstances. After Delta filed for bankruptcy, Lone Star filed claims pursuant to the TIAs. Lone Star argued, in those claims, that Lone Star would be entitled to compensation if Delta's defaults under the Leases resulted in an exercise of remedies and a "foreclosure" of the Owner Trust's interests in the relevant aircraft.

---

[1]     The notation "**D**" refers to Appellant's Designation of Record and the notation "**CD**" refers to Appellees' Counter-Designation of Items for Inclusion in Record on Appeal.

1

Subsequently, Lone Star sold all of Lone Star's interests in the Owner Trust to V20D-757X3 LLC, an entity affiliated with Vx Holdings, Inc. ("**Vx**").  Lone Star made this agreement in order to liquidate its interests in the aircraft at a favorable price.  The buyer, Vx, then paid off the outstanding debts (as Lone Star itself could have done).  No foreclosure took place, and the Owner Trust's ownership of the aircraft was never disturbed.

Delta and the Committee filed an objection to Lone Star's claims, arguing that Lone Star was not entitled to indemnification under the TIAs.  Delta and the Committee relied on Section 7(a) of each TIA, which states:

> SECTION 7. Excluded Events. Notwithstanding any provision to the contrary contained in Section 6 hereof, the Owner Participant shall not be entitled to any payment under Section 6 hereof to the extent any Loss or Foreign Tax Credit Loss arises as a result of one or more of the following events:
>
> (a) any voluntary or involuntary sale or other disposition (other than a substitution or replacement) by the Owner Participant of the Aircraft or any interest or beneficial interest therein or in the Trust Estate or any part thereof, unless a Lease Event of Default shall have occurred and be continuing at the time of such sale or disposition and such sale or disposition is attributable to the exercise of a remedy available to the Owner Participant pursuant to Section 15 of the Lease in response to the occurrence of such Lease Event of Default;

*See, e.g.,* TIA for N636DL (emphasis added) (Ex**.** A to TIA Transfer Obj. 1 [CD 1] (the "**Transfer Objection**")).

The Bankruptcy Court held a hearing and considered the arguments and submissions of the parties on September 7, 2007.  The Bankruptcy Court subsequently entered a decision dated October 5, 2007 (the "**Decision**") [D 3] , in which it sustained the objections to Lone Star's claims.  The Bankruptcy Court found (as the parties had admitted) that no foreclosure of the Owner Trust's interest in the aircraft had occurred and that Lone Star had made an economic choice to sell its interests in the Trust Estate.  Decision at 7-8, 13-14.  Under these circumstances, the Bankruptcy Court held that the sale or disposition that occurred was not

2

"attributable to the exercise of a remedy" under the Leases, and that Lone Star had no rights to seek indemnification under the TIAs. *Id*. at 13-14.

Lone Star's primary argument on appeal is that the Indenture Trustee threatened to exercise remedies and that these threats influenced Lone Star's desire to sell its interests in the Trust Estate. *See* Lone Star Br. at 10-11, 14-16. However, the TIAs do not provide that Lone Star is entitled to indemnification for a sale that is "influenced" by a "potential" exercise of remedies. Instead, the TIAs plainly and unambiguously provide that Lone Star has no rights unless the sale or disposition that occurs is "attributable to" the "exercise" of remedies. As the Bankruptcy Court correctly held, "[w]hen the terms are interpreted according to their ordinary, natural meanings the result is clear" that the sale of an Owner Participant's interests must arise from the actual exercise of a remedy in order for the Owner Participant to have valid tax indemnity claims. *See* Decision at 14.

Lone Star also argues that a minor drafting error in a different portion of Section 7(a) of the TIA (a reference to the "Owner Participant" that admittedly should have been a reference to the "Owner Trustee") somehow required the Bankruptcy Court to treat the other portions of Section 7(a) as though they were ambiguous. *See* Lone Star Br. at 19-21. There is no merit to this contention. The erroneous reference to the "Owner Participant" is irrelevant to the language that is at issue and to the issues that Delta and the Committee raised in its objection.

For these reasons, and as explained further below, Lone Star's Appeal should be denied and the Order should be affirmed.

## STATEMENT OF BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001. The Order is a final, appealable order. *See* 28 U.S.C. § 158(a)(1).

3

## COUNTER-STATEMENT OF ISSUE PRESENTED

Whether the Bankruptcy Court correctly held that Lone Star's TIA Claims were barred by the terms of Lone Star's TIAs.

## APPLICABLE STANDARD OF APPELLATE REVIEW

On appeal, a federal district court reviewing an order of the bankruptcy court accepts its factual findings unless they are clearly erroneous and reviews its conclusions of law *de novo*. *See* Fed. R. Bankr P. 8013; *In re Enron Corp.*, 364 B.R. 482, 485 (S.D.N.Y. 2007).

## STATEMENT OF FACTS

**A.    Leveraged Leases and the Lone Star Transactions**

A summary of the three leveraged lease transactions that are the subject of this Appeal is set forth in pages 3-7 of the Transfer Objection.  *See* Transfer Obj. at 3-7 [CD 1]; *see also* Decision at 3-5 [D 3]. There is no dispute that each transaction included these basic features:

> (a)   The Owner Trust received (i) an equity contribution from the Owner Participant (Lone Star) and (ii) borrowings from one or more lenders, and used the funds to purchase one or more aircraft;

> (b)   The Owner Trust (as Lessor) entered into a Lease with Delta (as Lessee); and

> (c)   The Owner Trust granted a security interest in the aircraft, and in the Lease, to the Indenture Trustee.

*See* Decision at 3-5; *see also* Lone Star Br. at 4-5.  Section 15 of each Lease also provided that the Lessor (initially, the Owner Trustee, and subsequently the Indenture Trustee, as assignee) could exercise various remedies in response to an Event of Default, including the right to sell the aircraft.  *See, e.g.*, Lease for N636DL (Ex. H to Transfer Obj.), § 15.

4

Leveraged lease transactions provide significant tax benefits to Owner Participants. The Owner Trusts are "grantor trusts" whose existence is ignored for tax purposes, so that all income and deductions are attributable to the Owner Participants.  As a result, Owner Participants are entitled to take accelerated depreciation deductions with respect to the aircraft.  *See* Decision at 5; Lone Star Br. at 4-5.

In each leveraged lease transaction, the TIA included a provision under which the Lessee (Delta) agreed to pay certain amounts to the Owner Participant if, "as the result of" any "act or omission" by Delta, the Owner Participant had a "recapture" of certain depreciation deductions. *See, e.g.,* TIA for N636DL (Ex. A to Transfer Obj), § 6(a).  However, Section 7 of each TIA also contained a number of exclusions.  One of those exclusions (set forth in Section 7(a) of each TIA) makes clear that the Owner Participant is not entitled to indemnification if its tax "Loss" is triggered by a sale or a transfer of the Owner Participant's interests in the aircraft or in the Trust Estate.  The only exception is if "a Lease Event of Default shall have occurred and be continuing at the time of such sale or disposition and such sale or disposition is attributable to the exercise of a remedy available to the Owner Participant pursuant to Section 15 of the Lease in response to the occurrence of such Lease Event of Default."  *See*, *e.g., id.* at § 7(a).

## B.    The Lone Star Claims

On August 16, 2006**,** Lone Star filed Proofs of Claim 4933, 4948, and 4950 (the "**Lone Star Claims**") against Delta, seeking tax indemnities pursuant to the TIAs.  In its Proofs of Claim, Lone Star alleged that it expected to suffer "Losses" if and when there was a foreclosure of Lone Star's interests in the aircraft.  In Proof of Claim 4933 with respect to the aircraft with tail number N636DL, for example, Lone Star explained as follows:

> The Debtor's bankruptcy filing is an event of default under the Lease giving
> the Indenture Trustee the right to foreclose the Owner Participant's right, title

> and interest in and to the Aircraft.  A foreclosure or other event could occur following rejection of the Lease by the Debtor in its bankruptcy case or during the bankruptcy or after emergence following Debtor's assumption of the Lease, that gives rise to the imposition of a tax against the Owner Participant or to the loss of the Owner Participant's tax benefits, in each case giving rise to Debtor's indemnity obligations under the TIA.

*See* Attachment to Claim 4933 (Ex. B to Transfer Obj.), ¶ 7.  Lone Star recognized that its claims were contingent and would mature only if and when foreclosures occurred:

> Owner Participant's experience in other airline bankruptcies suggests that if the foreclosure has not taken place prior to a debtor's emergence from bankruptcy it will take place shortly thereafter.  Therefore, while the tax indemnity claim is contingent as of the filing of this Proof of Claim, there is a high likelihood that an event giving rise to a claim under the TIA will occur in the near term.

*Id*.  In its claims, Lone Star also described the tax effects of a foreclosure and the manner in which its contingent claims had been calculated:

> The taxable income resulting from the foregoing foreclosure will equal the excess of (a) the sum of the amount of the non-recourse loans outstanding and all other amounts owing under the Trust Indenture over (b) any remaining tax basis in the Aircraft.

*Id*. at ¶ 11.  Lone Star contended that this "taxable income" upon foreclosure would be the equivalent of an indemnifiable "recapture" of its depreciation deductions, since Lone Star's "tax basis" in the aircraft was a function of those prior depreciation deductions.

Lone Star made similar allegations in the other Lone Star Claims.  *See* Claim No. 4948 (Ex. C to Transfer Obj.), ¶¶ 7, 11; Claim No. 4950 (Ex. D to Transfer Obj.), ¶¶ 7, 11.  Lone Star sought tax indemnities for the three transactions in the total amount of $15,366,990.19.

## C.    Lone Star's Sale of its Interests in the Trust Estates

As explained above, Lone Star's claims envisioned a foreclosure by the Indenture Trustee and a resulting termination of the Owner Trust's ownership of the aircraft.  As it turned out, however, there was no foreclosure.  Instead, Lone Star sold its interests in the Trust Estate to Vx.

6

In early 2006, Lone Star was asked (by the lenders) whether Lone Star would be interested in repaying the outstanding debts on the aircraft, as Lone Star had the right to do. *See* Affidavit of David B. Gebler, dated September 4, 2007 [D 9], ¶¶ 6, 9. Lone Star then identified a potential buyer who would purchase Lone Star's position on terms that "would generate an acceptable recovery by Lone Star, after the outstanding debt on the aircraft had been repaid at par." *Id*. ¶ 10. Lone Star informed the Bankruptcy Court that Lone Star entered into an agreement on May 30, 2006 to sell Lone Star's interests to Vx; Lone Star did not submit the agreement to the Bankruptcy Court, but it characterized the agreement as a sale by which Vx would have stepped into Lone Star's shoes, after which Vx either would have repaid the outstanding debts or received whatever consideration was left to the Owner Participant following a foreclosure sale. *Id*. ¶ 11.

Lone Star contends that its agreement with Vx hit a snag when the lenders contended they were entitled to a premium upon repayment of the debt. *Id*. ¶¶ 14-15. Notwithstanding this uncertainty, Lone Star and Vx admittedly elected to proceed with the sale of Lone Star's interests to Vx. *Id*. ¶ 25.

On October 19, 2006, Lone Star, WTC and Vx entered into three Assignment and Assumption Agreements (each, an "**Assignment Agreement**"), representing one Assignment Agreement for each of the aircraft. *See* Ex. E, Ex. F and Ex. G to Transfer Obj. [CD 1]. Through the Assignment Agreements, Lone Star sold (to Vx) all of Lone Star's "beneficial interest in the Trust Estate, including, without limitation, the Aircraft." *See, e.g.,* Assignment Agreement for N636DL (Ex. E to Transfer Obj.) at 1. As a result, Vx became the new "Owner Participant" in each transaction. Vx subsequently repaid the debt owed to the Indenture Trustee.

7

## STATEMENT OF THE CASE

Delta and the Committee filed TIA Transfer Objection 1 on May 25, 2007. They argued that the Lone Star Claims should be expunged because Lone Star's sales of its interests to Vx were not "attributable to the exercise of a remedy available to the Owner Participant pursuant to Section 15 of the Lease in response to the occurrence of such Lease Event of Default." *See* Transfer Obj. at 2-3, 10-11; TIA for N636DL (Ex. A to Transfer Obj.), § 7(a).

Lone Star filed its response on June 25, 2007 [D 5]. Lone Star asked the Bankruptcy Court to hold that "the Lessee remains liable to the Owner Participant under the TIA if the sale of the OP Interest is triggered by the Lessee's failure to honor its obligations under the Lease." Resp. of Lone Star to Transfer Obj. at 4 [D 5]. Lone Star contended that it was entitled to "cut its losses" once a Lease Event of Default occurred, and that the sale "resulted solely and directly from Delta's default." *Id.* at 4-5, 7. Finally, Lone Star argued that the reference, in Section 7(a), to the exercise of remedies by the "Owner Participant" did not make sense because it was the Owner Trustee (not the Owner Participant) who was a party to the Leases; Lone Star explained that the Owner Participant and the Owner Trust are the same for tax purposes, and that "[t]he TIA did not bother making any distinction between Owner Participant and Owner Trust because there is no such distinction in the tax world." *Id*. at 6.

Delta and the Committee filed a reply on August 29, 2007 [D 7]. They acknowledged that the mistaken reference to the "Owner Participant" in Section 7(a) should have been a reference to the "Owner Trustee," but pointed out that this particular point made no difference to the objection that had been asserted. Reply Mem. of Delta and the Committee at 3 [D 7]. They also argued that the plain language of Section 7(a) made clear that no indemnification was owed unless (a) an event of default had occurred, AND (b) the sale or disposition that occurred was "attributable to the exercise of a remedy" under Section 15 of the Leases. *Id*. at 3-4.

8

Accordingly, Lone Star's suggestion – that the mere existence of a default was sufficient – was contrary to the plain language of the contracts. *See id.*

Lone Star filed a sur-reply on September 4, 2007 [D 8]. In its sur-reply, Lone Star argued that it had sold its beneficial interests in the Trust Estate "after" the lenders had threatened foreclosure, and that Lone Star therefore should be entitled to indemnification. Lone Star Sur-reply at 2.

The Bankruptcy Court heard argument on September 7, 2007. Lone Star acknowledged during the hearing that no foreclosure sale had occurred and that the Owner Trust's ownership of the aircraft was never disturbed. *See* Transcript of Proceedings, September 7, 2007 (the "**September 7 Tr**.") [D 10], at 11, 18, 48. Lone Star also acknowledged that its tax liability was caused by the sale to Vx, not by a sale under the remedy provisions of the Leases. *Id.* at 14.

Lone Star also acknowledged during the hearing before the Bankruptcy Court that the aircraft had value that exceeded the outstanding debts, and that Lone Star could have exercised its right to pay off those debts (a right which was later exercised by Vx). *Id.* at 11-12, 14-15, 21-22, 29-30. If Lone Star had done so, it would not have incurred any tax loss. *Id.* Lone Star, however, did not want to deal with the lenders' request for a premium. *Id.* at 13-14. Lone Star agreed that it could have avoided any tax loss, but that it "looked at the economic alternatives and made a choice" to sell its position to Vx. *Id.* at 15-16.

Subsequently, on October 5, 2007, the Bankruptcy Court issued the Decision. The Bankruptcy Court found that there was no dispute that the first requirement of the "unless" clause was satisfied – that a Lease Event of Default had occurred and was continuing at the time of sale. *See* Decision at 10. The Bankruptcy Court also found that there was no dispute that a foreclosure of the Owner Trust's interest in the aircraft never occurred, and that no sale under

9

Section 15 of the Lease actually occurred. *Id.* The Bankruptcy Court noted, however, that the Indenture Trustee had threatened a foreclosure, and that the parties disagreed as to whether, under these circumstances, Lone Star had made a sale that was "attributable to" the "exercise of a remedy" under Section 15 of the Leases. *Id.* The Bankruptcy Court then rejected Lone Star's arguments on these issues.

First, the Bankruptcy Court held that there was no "exercise of a remedy" under Section 15 of the Leases. *Id.* at 13. The Bankruptcy Court noted that Lone Star had argued that the Bingham Term Sheet "contemplated that the Indenture Trustee *would* foreclose on Lone Star's Aircraft," and this "set in motion a series of events…that resulted in Lone Star's attempt to find a buyer for the Aircraft." *Id.* at 10-11 (citing Lone Star Surreply at 3). However, the Bankruptcy Court observed that "[a]t most, the Bingham Term Sheet contemplated the *future* exercise of a remedy under the Leases when there would be a *future* foreclosure on the aircraft," and that the "'expectation' or even the 'inevitable chance' that 'remedies will be exercised in the future'" was not the same as the actual exercise of a remedy. *Id.* at 11.

The Bankruptcy Court rejected Lone Star's argument that the Indenture Trustee's service of notice and holding of an aborted auction constituted the exercise of a remedy under Section 15(b) of the Leases to "sell ... the Aircraft … at public or private sale." *Id.* at 11-12. The Bankruptcy Court held:

> If the aircraft had been sold, the remedy clearly would have been exercised. But, the planes were never sold – title never changed hands. Merely giving notice of an intent to sell, or even holding an unconsummated auction is not the same thing as selling the planes.

*Id.* at 12.

The Bankruptcy Court further held that "[i]f this Court were to read the provision requiring 'the exercise of a remedy' to include 'the attempted exercise of a remedy,' the result

would be to effectively eliminate the second condition in its entirety" because "once an Event of Default occurred, there would be no objective limiting principle guiding when an 'attempted' exercise of a remedy has occurred." *Id.*

Second, the Bankruptcy Court held that even if there had been the exercise of a remedy, Lone Star's tax losses were not attributable to such remedy, citing the affidavit submitted by Lone Star:

> Lone Star sold to Vx because Vx was willing to pay a very favorable price for the aircraft and Lone Star wanted to monetize its interests in the Trust Estates. The Debtholders were engaged in hard bargaining and took the position that they would not consummate a foreclosure sale to Vx unless Lone Star agreed to pay them a premium. Unwilling to pay the premium and fearing that the Debtholders would "let the sale to Vx get away," Lone Star chose to sell its Trust Estate interests in the planes to Vx "in order to monetize [its] interest in the Aircraft and circumvent the threat of the Debtholders to withhold any distributions to Lone Star until Lone Star had agreed to pay the premium they had demanded." (Gebler Affidavit at 6, 7.) It was motivated to do this because if the sale to Vx 'got away,' Lone Star would have "los[t] the prospect of recovering the excess of the sales price over the amount required to repay the debt, which by the Debtholders' estimates, even after payment of the premium they were demanding, *would exceed several million dollars*." (Id. at 6 (emphasis added).) Clearly, Lone Star's sale of its interests was not attributable to the exercise of a remedy under the Leases, but rather was, by its own admission, attributable to its desire to ensure a sale that would net it several million dollars and allow it to avoid paying the premium that the Debtholders were demanding.

*Id.* at 13-14.

Third, the Bankruptcy Court held that the terms of the TIA were not ambiguous because "[w]hen the terms are interpreted according to their ordinary, natural meanings the result is clear." *Id.* at 14.

Consequently, the Bankruptcy Court determined that Lone Star's sale to Vx was the source of its tax loss, and that "[t]he second requirement of Section 7(a)'s 'unless' clause – that the sale be 'attributable to the exercise of a remedy' – is not met in this case and Lone Star's

claims are consequently excluded from indemnification by the terms of Section 7(a) of the

TIAs." *Id.* at 14-15.

## ARGUMENT

I.    **THE BANKRUPTCY COURT CORRECTLY HELD THAT THE SALE OF LONE STAR'S INTERESTS IN THE TRUST ESTATES WAS NOT "ATTRIBUTABLE TO THE EXERCISE OF A REMEDY" UNDER SECTION 15 OF THE LEASES**

Section 15 of each Lease permitted the Owner Trustee (or its assignee, the Indenture

Trustee) to sell the aircraft if a default occurred.  Section 7(a) of the TIAs provided that this was

the only circumstance in which a "sale" of the aircraft (or of the interests in the Trust Estates)

would entitle the Owner Participant to make a claim under the TIAs.  Section 7(a) states:

> SECTION 7. Excluded Events. Notwithstanding any provision to the contrary contained in Section 6 hereof, the Owner Participant shall not be entitled to any payment under Section 6 hereof to the extent any Loss or Foreign Tax Credit Loss arises as a result of one or more of the following events:
>
>    (a) any voluntary or involuntary sale or other disposition (other than a substitution or replacement) by the Owner Participant of the Aircraft or any interest or beneficial interest therein or in the Trust Estate or any part thereof, unless a Lease Event of Default shall have occurred and be continuing at the time of such sale or disposition and such sale or disposition is attributable to the exercise of a remedy available to the Owner Participant pursuant to Section 15 of the Lease in response to the occurrence of such Lease Event of Default;

*See, e.g.,* TIA for N636DL (emphasis added) (Ex. A to Transfer Objection [CD 1]).  Section 7(a)

plainly excludes any tax loss attributable to any "voluntary or involuntary" sale other than the

limited circumstance where a sale is attributable to the exercise of remedies under Section 15 of

the Lease during and in response to an event of default.  Section 7(a) also makes clear that the

mere existence of a default is not enough: instead, the sale or disposition itself must be

"attributable to the exercise of a remedy" under Section 15 of the Leases.

12

The gist of Lone Star's argument on appeal is that the words "attributable to the exercise of a remedy" merely require that a sale be influenced or partially motivated by the prospect that a remedy could be exercised.  *See* Lone Star Br. at 10-16, 18.  Lone Star's arguments are not consistent with the plain language of the relevant phrase, and are without merit.

First, in context the words "attributable to" do not mean "influenced by" or "motivated by."  The Oxford English Dictionary defines the adjective "attributable" as "capable of being attributed or ascribed, *esp.* as owing to, produced by."  OXFORD ENGLISH DICTIONARY 774 (2d ed. 1989) (emphasis added).  The requirement that the sale be "attributable to the exercise of a remedy" means that the sale itself was "owing to" or "produced by" the exercise of a remedy.  As Judge Hardin observed at the September 7 hearing, the plain meaning of the language used in the TIAs is that the tax losses that occur upon a sale are not covered unless the sale is thrust upon the owner participant as a result of an exercise of remedies under the Leases:

> And what the parties had in mind was, in essence, if for the owner participant's own economic objectives, as opposed to something that is forced upon them, they decided that they would make a sale of their ownership interest, and if that results in a tax loss, you're on your own.
>
> But if, as a consequence of a default by Delta, the lessee and, once again, something happens that deprives the owner participant of its ownership interest in accordance with the exercise of a remedy under the lease, as opposed to a voluntary transaction by the owner participant, you lose your tax benefits.  Why, then you're entitled to indemnification, but isn't the concept here that if you're not deprived of your ownership interest; i.e., something that's necessary to preserve your tax position, by reason of something that is thrust [upon] you, but rather you enter into a transaction for your own economic self-interest, well, that's your choice and you don't get indemnified for the tax loss that you elected.
>
> It seems to me that's the sense I get out of these provisions, Section 6 and then Section 7(a).

*See* September 7 Tr. at 53-54.  Judge Hardin went on to observe:

> It seems to me that Lone Star lost its tax benefits not because it was foreclosed, because it was not foreclosed, in point of fact; not because even

> the owner trustee exercised the right to sell, which would have forfeited the tax benefit; because the owner trustee didn't do that.
>
> And in fact, the planes are still in use, albeit under a new lease, which would not result in a loss of tax benefits. The indenture lenders are paid off, which is not something that would result in a loss of tax benefits.
>
> The only thing that resulted in a loss of tax benefits was that for its own economic self-interest, and perhaps a hard-line bargaining position with the lenders, Lone Star elected to sell its position and that's why they lost the tax benefits.

*Id*. at 54-55.

Judge Hardin's reasoning was correct, and is the only reasonable interpretation of the words "attributable to" in the context of this particular agreement. *See, e.g., Mulack v. Hickory Hills Police Pension Bd.*, 252 Ill. App. 3d 1063, 1070-71 (1st Dist. 1993) (where a worker refused reasonable treatment for an injury, the worker's disability was not "attributable to" the injury itself based on the statute providing compensation for a disability); *Ogle v. Superior Court*, 4 Cal. App. 4th 1007, 1018-19 (5th Dist. 1992) (delay in trial was not "attributable to" defendant for purposes of the defendant's speedy trial right under the Sixth Amendment; although the defendant had failed to appear for a hearing and that had contributed to delay, the police, with diligence, could have located and arrested the defendant). The words "attributable to," as used in the TIAs, require more than a mere tangential connection of the kind that Lone Star asserts. *See, e.g., Alstrin v. St. Paul Mercury Ins. Co.*, 179 F. Supp. 2d 376, 398-400 (D. Del. 2002) (exclusion in insurance policy for claims against the insured that are "attributable to" an insured's illegal profit did not exclude coverage for securities fraud claims merely because the defendants' profit from the allegedly fraudulent conduct was a "by-product" of that conduct; the words "attributable to" meant that the exclusion applied only if the complaint alleged that the profit itself was illegal). Here, it is clear that Lone Star's sale was not "attributable to" the

14

exercise of a remedy in the manner required by the TIAs, because the parties acknowledged that no sale remedy under the Leases was ever exercised.

Second, the only sale for which indemnification for tax losses is provided is a sale that is attributable to an "exercise" of remedies – not a "potential," or "possible," or "threatened" exercise of remedies, but an actual exercise of remedies.

Lone Star asserts, on appeal, that the Indenture Trustee's notice of an intent to sell and to hold an auction for the aircraft constituted the exercise of a remedy under Section 15(b) of the Leases. *See* Lone Star Br. at 14-16. However, the remedy set forth in Section 15(b) is the Lessor's ability to "*sell* or otherwise dispose of the Aircraft or any part thereof (including any Engine), at public or private *sale*." *See* Lease for N636DL (Ex. H to Transfer Obj.); § 15(b) (emphasis added). "Merely giving notice of an intent to sell, or even holding an unconsummated auction is not the same thing as selling the planes." *See* Decision at 12.

If the parties had intended to cover a sale "prompted" by the "attempted" exercise of remedies, or by steps "leading up to" a potential exercise of remedies, they could have plainly used those terms. In fact, the parties did use comparable terms in other places in the Leases and Trust Indentures. *See, e.g.,* Lease for N636DL (Ex. H to Transfer Obj.), § 15 at p. 60 (referring to "the exercise or beginning of exercise by Lessor of any one or more of such remedies"), Trust Indenture § 7.05 at p. 53 (referring to "the exercise or the beginning of the exercise of any power or remedy"); Trust Indenture § 7.02 at p. 46 ("if the Indenture Trustee shall be attempting to exercise the Lessor's right to repossess the Aircraft…"). By stark contrast, Section 7(a) refers only to an "exercise" of remedies, not a "threatened" or "possible" or "intended" exercise of remedies.

15

Nor is it enough for Lone Star to contend (as it did before the Bankruptcy Court) that its sale occurred after an Event of Default had occurred. Lone Star's TIAs all plainly state that a loss that results from a sale does not qualify for a tax indemnity payment unless (a) a default is outstanding, and (b) the sale or other disposition is "attributable to the exercise of a remedy" under Section 15 of the Lease. The mere existence of a default is not enough.

As Delta pointed out in the proceedings before the Bankruptcy Court, parties knew how to negotiate more limited exceptions to the TIAs when that is what they intended. Delta pointed to TIAs executed by Comair (Delta's affiliate), for example, which provided coverage for losses incurred as a result of any sale that occurred during a period when a default was outstanding. For instance, Section 4(f) of the TIA for Tail No. N409CA states:

> Excluded Events. Lessee shall not be required to make any payment to Owner Participant provided for herein to the extent a Loss or Foreign Tax Credit Loss occurs as a direct result of one or more of the following events:
>
> (1) any sale, exchange, transfer or other disposition by the Owner Trustee or Owner Participant of the Aircraft or any Part thereof, the Trust Estate, or the Lease, or any interest in any of the same, unless such transfer is (i) made following the occurrence of an Event of Default that is continuing (except in a situation in which Owner Participant has been paid in full Stipulated Loss Value or Termination Value in accordance with the Operative Documents); (ii) in connection with a repair, replacement, improvement, addition or modification or substitution of the Aircraft or any Part thereof by a Lessee Person;

*See* Reply Mem. of Delta and the Committee [D 7] (emphasis added). The TIAs at issue in the Transfer Objection, however, plainly impose an additional requirement. That language cannot simply be disregarded. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (a contract interpretation that would render a clause superfluous or meaningless is not permitted).

Lone Star's interpretation of Section 7(a) would mean that virtually any sale that occurred following an Event of Default would be covered by the TIAs, because the mere issuance of a notice of default, or other recognition of the default, would constitute an exercise of

16

a remedy.  This would make a mockery of the provision as a whole, which plainly states that the mere existence of an Event of Default is not enough.  As Judge Hardin observed, "once an Event of Default occurred, there would be no objective limiting principle guiding when an 'attempted' exercise of a remedy has occurred."  *See* Decision at 12.

Third, Lone Star's own admissions to the Bankruptcy Court make clear that the sale of its interests in the aircraft was not attributable to the exercise of a sale remedy by the Indenture Trustee, as assignee of the Leases.  Lone Star acknowledged that the value of the aircraft and the new lease exceeded the outstanding debt and that Lone Star had the right to pay off the existing debts, thereby avoiding any foreclosure and also avoiding any tax loss.  Lone Star acknowledged that it preferred to sell its position to Vx, and to let Vx bear the burden of arguing with the lenders over a "premium" that the lenders had demanded.

It strains credulity for Lone Star to contend on appeal that this voluntary sale of a valuable asset was somehow "attributable to" the exercise of a foreclosure remedy.  As Lone Star has conceded in its appellate brief, Lone Star considered "alternatives to foreclosure" and "chose the best option available to it."  *See* Lone Star Br. at 17.  The Bankruptcy Court correctly held that because Lone Star sold its beneficial interests "in order to monetize [its] interest" and to recover "the excess of the sales price over the amount required to repay the debt," Lone Star's sale of its interests was not attributable to the exercise of a remedy under Section 15 of the Leases.  *See* Decision at 13.

17

II.     **NO SALE REMEDY WAS EXERCISED UNDER THE LEASES, AND LONE STAR'S ARGUMENTS ABOUT OTHER POSSIBLE EXERCISES OF REMEDIES ARE IRRELEVANT AND/OR INACCURATE**

Lone Star acknowledges that the Indenture Trustee never actually sold the aircraft pursuant to the sale remedies in Section 15 of the Leases.  Lone Star argues, however, that the Indenture Trustee took other steps to exercise different remedies under the Leases.

<u>First</u>, Lone Star argues that the Indenture Trustee exercised a remedy under the Leases when it entered into a term sheet that called for the restructuring of the Leases.  *See* Lone Star Br. at 12-13.  This argument refers to a term sheet that the Indenture Trustee and Delta entered into on February 15, 2006 (the "**Bingham Term Sheet**"), which was approved by an order of the same date (the "**Term Sheet Order**").  Pursuant to paragraph 8 of the Term Sheet Order, Delta was authorized "to negotiate and to enter into definitive agreements effectuating the terms set forth in the Term Sheet, without the need for further application to this Court."  *See* Term Sheet Order at 7 (attached to the Gebler Affidavit as Exhibit A) [D 9].  More specifically, the Bingham Term Sheet contemplated future agreements to be entered into to restructure the financing terms and conditions concerning certain aircraft:

> The Existing Transactions as to each type of Aircraft will be restructured to reflect the terms set forth in this Term Sheet, including <u>Annex C</u>, and, in the form so restructured, will be assumed as part of the confirmation of Debtor's plan of reorganization (effective no later than the effective date of such plan), unless an Aircraft is rejected or abandoned in accordance with this Term Sheet.

*See* Ex. A to Term Sheet Order at 1.  In a section entitled "Calculation of Pre-Petition Damage Claims/Unsecured Claims," the Bingham Term Sheet also included a formula for the calculation of claims that an Indenture Trustee could assert for damages under the aircraft leases.  *Id.* at 2-5.

Lone Star argued that the Bingham Term Sheet represented an actual exercise of remedies under Section 15 of the Lease.  The Bankruptcy Court rejected these arguments and

18

held that "the Indenture Trustee's authority to enter into the restructuring agreement did not derive from the remedies section of the Leases but rather from the inherent power of any party to contractual arrangements to renegotiate the terms of those arrangements." *See* Decision at 11.[2]

More importantly, it is not necessary for this Court to decide which provisions of the documents gave the Indenture Trustee the right to enter into the Bingham Term Sheet. The gist of Lone Star's contention on appeal is that indemnification is available under the TIAs so long as a sale "follows" an event that can be characterized as an exercise of remedies. However, the TIAs plainly exclude all tax losses resulting from a sale unless the sale itself is "attributable to" the exercise of a remedy under the Leases.

Here, the Bingham Term Sheet, and its approval by the Court, did not effectuate a sale of the aircraft. It is true that the Term Sheet contemplated a possible foreclosure, but no such foreclosure ever occurred, and no actual "exercise" of the foreclosure remedy itself ever occurred. Furthermore, the Bingham Term Sheet did not mandate that a sale occur. As Lone Star has admitted, Lone Star had the right to pay off the outstanding debts and thereby the right (i) to prevent a foreclosure sale, (ii) to redeem the Leases from the liens of the Indenture Trustees, and (iii) to avoid any tax losses. Lone Star's successor, Vx, actually exercised those pay-off rights. The Owner Trusts continued to own the aircraft, and later entered into new leases

---

[2]    Lone Star argues, on appeal, that Section 8.01(e) of the Indenture allegedly required the consent of the Owner Participant in order for the Indenture Trustee "to amend, modify or supplement" certain sections of the Lease. *See* Lone Star Br. at 13. The relevance of this particular argument is not clear. In any event, the argument is without merit. The Indenture Trustee was not attempting, through the Bingham Term Sheet, "to amend, modify or supplement" the existing Leases. Rather, the Bingham Term Sheet contemplated the future rejection and termination of the existing Leases, and the execution of an entirely new set of operative documents, including new leases. Paragraph 15 of the Term Sheet Order even specifically states that "[u]ntil such time as definitive agreements are subsequently entered into . . . (a) the Term Sheet does not affect any term or provision of the Aircraft Agreements . . . and (b) the Term Sheet shall not constitute an amendment or waiver of any provision of the Aircraft Agreements…." *See* Term Sheet Order at 10.

(consistent with the terms in the Bingham Term Sheet), without any disruption to the Owner Trust's ownership of the aircraft.

Accordingly, Lone Star's voluntary sale of interests in this case was not "attributable to" the Bingham Term Sheet.  Even if the Bingham Term Sheet referenced a possible foreclosure, as the Bankruptcy Court observed, "[t]he Indemnity Agreement is unequivocal in saying "'the exercise,' not the 'expectation' or even the 'inevitable chance' that 'remedies will be exercised in the future.'"  *See* Decision at 11.

Second, Lone Star argues that the Indenture Trustee filed proofs of claim seeking amounts due under the Leases, and thereby "exercised remedies" by seeking damages.  *See* Lone Star Br. at 11-12.  Again, however, the TIAs require that a "sale" be "attributable to" an exercise of remedies.  At no point in the proceedings before the Bankruptcy Court did Lone Star ever contend that the sale of its beneficial interests in the Trust Estates was caused by the filing on August 21, 2006 of the Indenture Trustees' proofs of claim.  Nor could Lone Star credibly make such a claim.

Lone Star's attempt to seize upon these particular alleged "exercises of remedies" just illustrates the extent to which Lone Star's interpretation of the contract would undermine and frustrate the plain language and meaning of Section 7(a).  It is impossible to have an "Event of Default" without having some action – even the mere assertion that a secured party owns the rights of the Lessor – that Lone Star would characterize as the "exercise of a remedy."  If this were enough, then any sale that occurs while a default is outstanding could be characterized as having been "motivated" by the exercise of a remedy.  However, Section 7(a) plainly states that the mere existence of a default is not enough.  Section 7(a) excludes indemnification for tax losses arising from "any" voluntary "or involuntary" sale of the aircraft, unless the sale itself is

"attributable to" the exercise of remedies under Section 15 of the Lease (which permits the sale of the aircraft). No such sale occurred in this case, and no indemnification is available.

### III.     THE BANKRUPTCY COURT CORRECTLY HELD THAT THE <u>CONTRACTUAL LANGUAGE WAS NOT AMBIGUOUS</u>

Lone Star argues that Section 7(a) is ambiguous and that the Bankruptcy Court should have considered extrinsic evidence in order to ascertain its meaning. Lone Star's argument is without merit.

<u>First</u>, Lone Star argues that Section 7(a) is generally ambiguous because Section 7(a) requires that the relevant sale or disposition of the aircraft by the Owner Participant be "attributable to the exercise of a remedy *available to the Owner Participant pursuant to Section 15 of the Lease*…" TIA for N636DL (Ex. A to Transfer Obj.), § 7(a) (emphasis added). Lone Star argues that it is the Owner Trust (not the Owner Participant) who is the lessor under the Leases, and that no remedy pursuant to the Leases is ever available to the Owner Participant. *See* Lone Star Br. at 19-20; Lone Star Resp. at 6 [D 5]. What this plainly means – and what Delta and the Committee have acknowledged from the start – is that the words "Owner Participant" were mistakenly used in place of the words "Owner Trustee." *See* Reply Mem. of Delta and the Committee at 3 [D 7]. Lone Star itself acknowledged that this was the intent and that the words "Owner Trustee" should have been used. *See, e.g.,* Lone Star Resp. at 5-6.

Lone Star has never contended that any other mistake occurred in the drafting of Section 7(a). Lone Star contends that the mistaken reference to the Owner Participant somehow makes the rest of Section 7(a) ambiguous, but that contention is absurd. Lone Star has never identified any words in Section 7(a) that are ambiguous except for the plainly mistaken reference to the "Owner Participant." The Bankruptcy Court was correct in substituting the phrase "Owner

Trustee or Indenture Trustee" for the term "Owner Participant" in order to give effect to the drafters' clear intent, as all parties agreed. However, the rest of the provision was clear.

The search for "ambiguity" in a contract is not a test, in which parties are punished for a minor mistake by being deprived of the benefits of other provisions that are perfectly clear in their wording and import. It was appropriate for the Bankruptcy Court to correct the one admitted mistake in Section 7(a) and to enforce the remainder of the provision as it was written. The mistaken reference to the "Owner Participant" was not a basis for the Transfer Objection or for the Bankruptcy Court's ruling, and it is completely irrelevant to the Order and to this appeal.

Second, Lone Star argues that the phrases "attributable to" and "the exercise of a remedy" are ambiguous and that the Bankruptcy Court erred in excluding extrinsic evidence. See Lone Star Br. at 21-23. Lone Star is incorrect. Under New York law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Id.* at 569 (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)) (brackets in original).

An agreement is not ambiguous merely because the parties assert differing interpretations of the words used in the agreement. "The court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would 'strain[] the contract language beyond its reasonable and ordinary meaning.'" *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (citing *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 459 (1957)).

22

Furthermore, the only "intent" that is relevant in the interpretation of a contract is the mutual intent that is discernible from the words that the parties actually used in their agreement. *See Hotchkiss v. Nat'l City Bank of New York*, 200 F. 287, 293 (S.D.N.Y. 1911) (Hand, J.) ("A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent."). As Judge Easterbrook held in *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987):

> . . . "intent" does not invite a tour through [a party's] cranium, with [the party] as the guide. . . . "The intent of the parties [to be bound] must necessarily be derived from a consideration of their words, written and oral, and their actions."

(Internal citations omitted).

Here, the phrases "attributable to" and "exercise of a remedy" include terms of common usage and understanding with consistent lay and legal dictionary definitions. The Bankruptcy Court's interpretation of the contract – that there is no indemnification unless a sale occurs as a result of the actual exercise of a remedy under the Leases – is consistent with the plain language of Section 7(a). Lone Star's interpretation would alter that plain language, not interpret it. Lone Star would have this Court modify the exclusion so that Lone Star is indemnified for losses if a sale is "motivated" or "influenced" by a "potential" exercise of remedies. That is not what the contract actually says.

The Bankruptcy Court enforced each TIA in accordance with its "definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself." *See Greenfield*, 98 N.Y.2d at 569-70 (N.Y. 2002). Accordingly, no extrinsic evidence was needed or appropriate.

23

## **CONCLUSION**

For all of the foregoing reasons, and those stated in the Decision, Delta and the

Committee submit that the Order should be affirmed.

Dated:  New York, New York        Respectfully submitted,
       February 19, 2008

                            DEBEVOISE & PLIMPTON LLP


                            /s/ Michael E. Wiles
                            Michael E. Wiles
                            Richard F. Hahn
                            919 Third Avenue
                            New York, New York 10022
                            Telephone:  (212) 909-6000
                            Facsimile:  (212) 909-6836
                            Special Aircraft Attorneys for Reorganized Debtors

                            AKIN GUMP STRAUSS HAUER & FELD LLP


                            /s/ David H. Botter
                            David H. Botter
                            590 Madison Avenue
                            New York, NY 10022
                            Telephone: (212) 872-1000
                            Facsimile: (212) 872-1002
                            Counsel for the Post-Effective Date Committee